United States Court of Appeals for the Fifth Circuit is now open according to law. God save the United States and this honorable court. Good afternoon. Our first case for today is 2020-20389 Landmark American Insurance Company v. SCD Memorial Pl II LLC. Mr. Brown, you may proceed. Thank you. May it please the court, I'm Jay Brown here on behalf of the appellate Landmark American Insurance Company. SCD has not met its burden to show that the damage was directly caused by specified named peril and that's critically important here because the landmark policy is a named peril policy. The peril that caused the damage here is flood and flood is not named in the landmark policy. To illustrate the landmark policy, I'd like to compare it very briefly with the only other policy in the record here. The landmark deductible buyback policy is a creature of an entirely different species from the Lexington policy, which is an all-risk policy that specifically includes flood. The Lexington policy is a primary policy, multiple locations, multiple states, $167 million in limits. The landmark policy, on the other hand, is a named perils policy. It is not all risk. It has completely different terms. It's only for this location and then it's only for two narrowly defined perils, windstorm or hail, and only for windstorm or hail associated with the named storm. It was not issued, as the evidence shows, to ensure all the perils within the deductible of the Lexington policy, but only for windstorm or hail associated with the named storm. Brown, where does, where in the policy are perils and occurrence defined, if anywhere? Yes, Your Honor, they are, and they are defined differently and distinctly. The concept of occurrence is defined in the landmark definition of loss, and it says, loss shall mean a loss or series of losses arising out of one event or occurrence. The concept of perils is, and if I may, let me get to the concept of perils through the But are there discrete, like, unmistakable definitions in the policy of perils and occurrence? The perils in the policy are identified in item three of the schedule, and it says perils covered windstorm or hail associated with a named storm, and our position is, well, that the words windstorm or hail associated with have meaning, and that the district court, in our briefs, it's clear that the district court disregarded the meaning from those words, and that named storm here is clearly the occurrence, and the perils are windstorm or hail associated with that occurrence, and that is clear in the language of the landmark policy. It is particularly clear it begins with the insuring clause, and unlike a policy that has an all risk clause, this policy says it will indemnify the insured in respect of direct physical loss or damage caused by any of such perils as are set forth in item three. Just a moment on the word direct. It has a special meaning given to it under Texas law that's different from Louisiana law, which I'm no expert on, but direct fiscal loss when used in an insurance policy under Texas law requires the loss to be immediate or proximate without an intervening cause, and that's different from just caused by direct fiscal loss in quotes does not mean the same as quote fiscal loss in insurance policies under Texas law. We provided that to you. So with that in mind, the insuring clause says in respect of direct physical loss or damage caused by any of the such perils as are set forth in item three, we go to item three, and item three says perils covered windstorm or hail associated with just practically speaking, how does this work? And perhaps I should know this already. If the wind, we normally think of hurricanes as involving both flooding and wind and related wind to flooding, and I think that the district court obviously kind of grouped those together as being part of the normal circumstances of a hurricane. Um, how does this work whenever the roof is blown off and then the facility the building fills up with water? Yes, your honor. As a starter here, there's no evidence at all that that happened, but if the roof is blown off, the direct cause of that was wind. It doesn't get blown off from flood, and most of these pop. Well, when that happens, the rain enters from the wind damage, and typically it's covered here as far as how it works. It's interesting because a deductible buyback policy is first of all, it's a bit misnamed, but it's a policy that comes into this what I'll call massive insurance program is already in place, and an insured wants to insure against specific perils for a location, and that is this as shown with an affidavit that we've submitted from the underwriter, from Josh Gibbs, the underwriter. He went through and he That's a very good question. It was certainly never addressed by the district court and never commented upon. It was submitted. It was never objected to, and it is within the record. It is uncontroverted, and it was not admitted as SCD would say to vary the terms of the contract. It's not admitted for that at all. It's admitted in keeping with the teachings of Texas law that you can admit an affidavit to show the business context under which a contract was entered into, and it was also admitted for the legal principle that there was different dollars charged for different risks, and there were no dollars charged for flood, and so therefore, in the unlikely event this court were to interpret this as somehow covering flood, there's been no consideration paid for that peril. But let me point out that the way that we're urging this policy work is exactly the way the court said the policy should work, exactly the way this court said the policy should work in the Westchester in the Six Flags versus Westchester case. And in that case, in our and the court said that the occurrence does not equal the peril. The peril is the cause of the loss, and the occurrence is not the cause. Judge Rosenthal, in dealing with the claim involving the Alley Theater, cited to Six Flags versus Westchester and explained it also, and she explained that occurrence is a distinct concept from the peril. And I think what happened with when the concept of peril and the concept of occurrence became conflated. Now, that's not to say, and bearing in mind the Texas Supreme Court teachings and noting that Judge Willett was on the FICE panel, and the court then cautioned us, and this court has cautioned us, that we must I'll note that other policies may define a named storm as a peril, and that's okay. They can do that. We want to give all the words meaning, but this policy does not. This policy is a named peril policy, and under the case law of this court and Texas courts, this court has In the Kodreg case, there was a question of the loss of contents in a house, and they would only be covered if the insured proved they were damaged by the named peril of wind, not by flood. That brings me to another question. What is your response to opposing counsel's argument that your definition of windstorm ignores the storm part of the word, and it sounds like you were trying to recast it as wind damage, which the last sentence you said was using that term. Well, no, I recognize the point. There obviously has to be damage, as we all know, to even make a claim, but the windstorm definition, it's very thoughtful, I believe, how the landmark policy, which is only going to be called to respond if there is a claim, adopts the very definition of windstorm from the Lexington policy, and windstorm is, or adopts the very definition of named storm from the Lexington policy. Named storm is defined in the Lexington policy as whatever the National Weather Service says it is, and that's important to know exactly what a named storm is, and for those of us that suffered through the weather in Texas two weeks ago, it was horrible. We heard about it. We lived through it, and I was a little bit chagrined that the National Weather Service did not declare it to be a named storm. The Weather Channel did. So it's important how things get to be defined, and to recap, the landmark policy goes to the definitions of named storm, and that's in parentheses, and it just says a hurricane, typhoon, or such that's defined, that's named by the National Weather Service. As far as the wind part of that, this court commented on what wind is in the Kemp case. The Kemp case from this court identified windstorm, and the Kemp course, the Kemp case relied upon Texas cases to identify windstorm, and it's our position that if the district court said, well, we don't know what the definition of windstorm is, well, this court has defined windstorm for us in the Kemp case, and windstorm was defined in the Kemp case. Basically, a windstorm must be taken to be a wind of sufficient violence to be capable of damaging insured property, and Texas courts have also defined windstorm. Texas courts, the Weatherman case is cited by this court and by Texas courts as having the definition of windstorm under Texas law, and that wording should be familiar because it came right out of the Weatherman case. So rather than have this term rendered meaningless, I would urge that windstorm be interpreted with the precedent provided from this court and from Texas law. Now, windstorm... Mr. Brown, tell me, to what degree is the Pan Am equities case relevant? Of course, it was a different contract term. It was a different type of policy. The guidance may be limited, but how does it help you if it does? I think the Pan Am, and I'll note that the Pan Am case was very different on its facts, but it really helps us distinguish between the importance of peril on the one hand and occurrence on the other hand. If I may, let me delve into Pan Am. In Pan Am, like here, the event, the occurrence was Hurricane Harvey. Again, the peril that caused the damage, though, was flood, just as here. Pan Am does not involve the question of whether the caused the loss because, as here, flood caused the loss. The Pan Am policy was an all-risk policy, not a named perils policy, as in here. But in Pan Am, it's instructive because the court had to identify and distinguish between the perils in order to know which deductible applies because the deductibles aggregated the damages from different perils into different deductibles. And it's interesting. The Pan Am illustrates that there's a difference between the occurrence and all the many perils associated with the occurrence. And specifically, the Pan Am case used this language. It said that named storm deductible provisions, quote, sweep in a slew of associated perils explicitly untethered from wind, comma, specifically flood. And that's exactly what happens here. Yes, when there's a hurricane, there are many different perils involved. Those perils are insured by an all-risk policy. Are they insured by a named peril policy? We have to look at the definition of perils insured. And this court teaches as well as the Texas Supreme Court that, and I like the language in the Pan Am course, in the Pan Am case, it said, Justice Willett writing, that Texas law commands that we honor the policy's plain language, every word on every page, giving effect to all the policy provisions. And here, the motherboard of this policy, every claim that comes in, every consideration for a named peril policy has to go through the insuring clause and the named perils provision. And here, the named perils provision, it doesn't say earthquake. It doesn't say fire. It doesn't say named storm. It says wind storm or hail associated with the named storm. Mr. Burke, you haven't discussed Mr. Miller's argument, at least I'm not sure that you've discussed it, that the Lexington policy definition of flood, wind, wind gust, et cetera, was incorporated into the wind storm that was due to a named storm, when you have a named storm. Can you just deal with whether or not that those words are used? No, they're not. I'm not quite sure. I apologize. I'm not sure I understand the question. The named storm phrase is embedded within the deductible provision, but it's just, that's the place where it's defined in the policy. And what it says is, it says named storm, and then there's a parentheses, and it gives the definition, and then another parentheses. And it basically said within those parentheses is a hurricane, a typhoon, a tropical storm that's identified by the National Weather Service as a named storm. It doesn't- No, I'm not talking about the named storm definition. I'm talking about the wind storm definition. Okay. If it's a named storm, you look to the wind storm definition of the Lexington policy, of the Lexington definition. If you don't, I know that you believe you don't, but can you explain to us why you don't believe we should look at that? Okay. I don't, I think there's no, none of the policies define wind storm. First of all, this court defines wind storm. Now, it's interesting that the Lexington policy does define named wind storm. It has a separate definition for named wind storm. Okay, if your position is nobody defines it, then that's the answer to my question. You've used your time, so you save time for rebuttal. I didn't realize my time without it. I'd like to address that further if the court doesn't feel like, because I'm not sure I understood it, but I'll listen. Thank you. Okay, well, maybe Mr. Miller will clarify it for us, and then you can address it on rebuttal. Thank you very much, or maybe he won't, and you don't, won't feel the need to, but thank you very much. Mr. Miller. Thank you. Mark Miller on behalf of the defendant, SCD Memorial Place 2 LLC. I want to do three things here that I think would help. One is I want to discuss the two policies and how they fit together. They fit together hand and claw, and two, I'd like to talk about the precedent this court has had with the various other cases that have dealt with different policies and how a ruling here does not disturb any of those rulings, and three, I'd like to bring in some public policy considerations. We've been in this for years, and we've spent a lot of time talking about it, and we think the contract language is pretty clear, and we don't think that parties should be submitting affidavits at the tail end of the proceeding about what they felt the policies meant. So, how do these policies fit together? I think this is critically important. SCD Memorial Place 2 is a building. They own a building in West Houston. It was impacted by a flood throughout the United States, and they bought a master policy, and this is important. It's not a throwaway. The master policy starts the discussion for this, and the master policy has two deductibles, and we saw this in Pan Am. It's actually Pan Am equities decision. It's actually the exact same policy. The master policy has two deductibles. It has a big one and a small one. It's $50,000, and the big one's for wind, storm, or hail, and I'm going to say open quote, wind, storm, or hail, close quote. It's the heading for that deductible provision. The heading for the deductible provision, wind, storm, or hail, says what that deductible is. It's 2.5% of total insurable values. That's a big number. The building's worth $71.1 million, so the deductible on that is $1.775 million. We did what Pan Am equities didn't do. We went out to the market to say, hey, can we buy deductible buyback insurance? The answer is yes, you can buy. If you look at the first page of the landmark policy, which is the policy at issue here, it says deductible buyback schedule. Throughout this, it buys back the deductible. It's just plain reading. We're buying back the deductible. What deductible are we buying back? It says perils covered, wind, storm, or hail associated with the name storm, and it's got two asterisks following the name storm definition in the Lexington Insurance Company policy. What do we have here? We have wind, storm, or hail. That phrase didn't come out of nowhere. It was to track the deductible provision. It was the deductible buydown insurance. The landmark policy throughout the policy says that incorporates all the terms of the Lexington policy. We went beyond what any other policyholder has done, at least as reviewed by the circuit. We did beyond what Pan Am did. We went out and bought a deductible buydown policy for what deductible, wind, storm, or hail, and that is the peril covered, wind, storm, or hail. Now, we think that's a simple issue. It's simple based on policy language, and it's simple based on the numbers. First, policy language. Well, I've been through that. It's wind, storm, or hail has meaning. The meaning is from the Lexington master policy. Let's look at the numbers. By that, the limits of the policy are $1,573,500. You add on that the $250,000 deductible in the landmark policy, and you get the exact same number that is 2.5% of the building value, $77.1 million. Mr. Miller, isn't it possible that you could have bought a policy that has a definition of wind, storm that is incongruous with the master policy so that you didn't get the coverage that you thought you were getting, but maybe that's for another day with your broker or something, but not... Just because that's what you sought doesn't mean that's what you got. Well, I think it is what we got because they use the phrase wind, storm, or hail, and the phrase wind, storm, or hail in the deductible buyback schedule is what's used in the main policy, and it uses the exact same phrase, wind, storm, or hail, and it's defined to include everything a storm would include. Okay. Is it ever defined to include flood, wind, wind gusts, storm surges, tornadoes, cyclones, hail, or rain? Is wind, storm, or hail defined as that? Is wind, storm ever to include that, ever define that? Well, is it ever defined? No, wind, storm, or hail is not defined. It's not defined. But it is... Well, then why would it list hail separately? If wind, storm includes hail, I mean, in the other policy it would include that, then why is it listed separately here? I asked myself that because I said, wind, storm is one thing, but why does it say or hail? And I kept scratching my head thinking about it, and the answer is this. It's because it tracks the language exactly in the master policy. If you look at the heading, it's wind, storm, or hail. That's what it's tracking. It's tracking that language. Wind, storm, or hail in one policy is tracking the wind, storm, or hail in the other policy. It's sort of... I wouldn't call it a term of art, but it's referencing the other policy language. Does your case rely upon reading the maintenance of primary insurance section of the landmark policy to mean that it intends to import the wind, storm deductible from the Lexington policy? Let me try to understand. I'm not sure I understand. It's a question, did Lexington do the wrong thing by applying the two and a half percent deductible, or am I reading your question incorrectly? How do you decide whether or not it imported the wind, storm deductible language? Are you saying it does? It must? A normal business person reads it. The one policy says it covers wind, storm, or hail. It covers the deductible. It's a deductible buyback, and the deductible that it includes in this scenario. Okay, what do you do with the fact that their argument is that this is not a wind, storm? It's just a basic argument. Well, it is. I mean, that it is a wind, storm, but it is a flood instead. Wind, storm, I mean, you can look at the definitions. We've said definitions are dictionary definitions, so be it what it may. Everybody in the dictionary at least understands that hurricanes or wind storms are associated with wind, and they're associated with rain and flooding and all those other things. We kind of know that from a common sense perspective. So, I would say if you're going to look to the law to find out what a wind, storm is, you can do that, but you don't need to. That's not our argument. Arguments is plain meaning. We look at the policies. You don't necessarily need to look at the law. You can, but you don't need to. This is a very, very specific question in a deductible buyback policy that's buying back a certain deductible. What are we buying back? What do you do with our courts with the Pan Am opinion? Yeah, so here's what different. Here's how Pan Am fits in with our case. Pan Am had the exact same master policy, and the court looked at it and said, well, are we going to apply the wind storm, the big deductible, or the small deductible, which was the exact same numbers? The small deductible was for flood. That was $50,000, and in Pan Am you said, hey, let's look at what the policy says, and you applied what the policy said, and it was the exact same language as in our master policy. The wind storm includes all these things that you associate with the wind storm, rain, hail, tornadoes, wind gusts, and flooding. So what we did differently from Pan Am is we did the extra step. We didn't come to you saying, oh my gosh, we think the small deductible should apply. We did it differently. We went and we bought coverage for that deductible, so we're one step removed. We're one step better, we would say, and I'd also address, I think the point is we don't need to get into these cases about wind damage versus flood damage, and there's a whole series of those cases in Texas and the Gulf Coast region. We're not trying to disturb any rulings that were entered in those cases. In all of those cases, for example, Codern is probably the leading Fifth Circuit case. In Codern, we had a state homeowners policy. If you look at that policy, it said it covers the named peril, wind storm, or hail, but in that named peril definition for wind storm or hail, what does it cover? If you look at the policy, it's defined so that it does not include loss caused by rain. In addition, there was also an exclusion for flood, and that's the way these policies work. They put the exclusion in, and they also define what the named peril is. We didn't have that here, and it's not an issue of whether we should have thought something differently about the policy because as you read the two policies together, to us at least, it's pretty clear. Now, I wanted to address this argument about named peril policies don't need exclusions. Now, an example, I guess, let's say you live in California, and for your house, you bought an earthquake policy, and then a tornado ripped through and tore up the house, and you make a claim under your earthquake policy and say, yeah, but you didn't include a tornado exclusion. Well, that's an example of where a named peril policy does not need an exclusion for tornadoes. Our situation is different. We have a windstorm, and if you look at what a windstorm is defined for common meaning, it would naturally include the wind portion and the storm portion. So, we look at that, and for a normal business person, what would you do to protect yourself? I don't care which side you're on, but if you're an insurance company, you would let's put the exclusion in because we have a windstorm, and flooding is associated with that. We want to exclude that. So, it was imperative on them to put that exclusion in the policy. If you look at the policy, the landmark policy, there's five exclusions in there. There's an exclusion for pollution. There's an exclusion for electronic data. There's an exclusion for fungus, wet rot, dry rot, and bacteria. There's an exclusion for terrorism, and there's an exclusion for pathogenic or poisonous biological or chemical materials. Now, terrorism has nothing to do with the hurricane, but at any rate, they put these exclusions in there. It was imperative. They make this clear to the person buying the policy that if they don't want to exclude flood, they don't keep it to themselves and keep it to their underwriter in this closed cubicle. They let us know, and they didn't let us know. They didn't put it in the policy. It's not part of the policy wording. I'd like to open it up for any other questions. Judge Willa, Judge Englehart, do you have any further questions for Mr. Miller? Mr. Miller, I think we understand your argument, sir, unless you have anything further. Yeah, let me address public policy and also how we're not trying to change any law with respect to any of this case. We realize that there's a bunch of cases out there that are these high water cases, and we're not trying to address this allocation issue. What if wind damage is property? What if there's windblown rain? What if there's all this stuff? Those are different types of policies. They have flood exclusions, and they also define what is covered. That's an issue we don't need to get into here. It's an issue that they want to drag us into. They want to have us go back to the district court and litigate that issue, but we don't need to do that here. We're not altering the case law. As far as public policy goes, a business owner in any state, they should be able to rely on the contract as written. If you look at the contract as written, it's a deductible buyback policy. It buys back that deductible, and you look at what deductible buys back. Well, it's a two and a half percent deductible. It's not what we thought. It's what we got. We got a policy that refers to another policy, the master policy, and it buys back that deductible. All this, I call it nonsense about wind and whether it's wind or not or whether it's an occurrence or whether it's apparel. That's stuff that doesn't matter. It doesn't make any difference. This is a policy that defines what it covers, and it covers the deductible. It buys back that deductible. Thank you. Thank you. We have your argument. Mr. Brown, you've saved time for rebuttal. Yes, thank you. Some points very quickly. First of all, the statement was made that the is not correct. In fact, in the maintenance of primary insurance clause, it has in all caps, except as otherwise provided herein. So, it does not blanketly incorporate everything in the Lexington policy. It says except as otherwise provided herein in all caps. Secondly, the- But you understand that this is certainly not useful. If they thought it was going to just be for the deductible, it's not going to because it's incongruous. They're not the same under your reading. So, it doesn't get them what they thought they were getting. Does it matter? I mean, you could say it doesn't matter, but- I don't mean to be- It would be parallel, and you're saying that they're not. Yeah. Actually, there's no evidence of that in the record, and I don't think it's true because that's not the way named peril policies work. If they wanted to have a below the deductible policy that included all the risk that their main policy did, then that would be an all risk policy. And guess what? It wouldn't be called a below the deductible policy. It would just be called the primary policy. The purpose of a- Yeah. So- Why did the policy not exclude flood damage the same way it excluded terrorism and fungus? Oh, because it doesn't need to according to this court's teaching of what a named peril policy is. And also, if it included an exclusion for flood damage, then it strips the very identity of the policy away. Then why did it include an exclusion for something else and something else? It's easy to see the terrorism is there as a result of the national terrorism law. It's in every policy now. It's easy to see why the data and all that. What they're saying is, look, even if you have something from a named peril, even if you have windstorm or hail, if it comes in and it ruins your data, we're not going to cover that. If it comes in and it causes fungus, we're not going to cover that. But you don't have to. So you pull that out of those perils. You had asked earlier, Your Honor, about definitions. And I'd like to remind the court that of all the definitions provided by both sides of windstorm, no definition contained the word flood. None. And I'd also like to look at this, the perils covered, where it says windstorm or hail associated with. And my point is, with those words using common ordinary meaning that we're supposed to meaning. And those are the perils. Whereas name storm is the occurrence or the event, just like in the Pan Am case and the perils, it says perils covered, windstorm or hail associated with the name storm. Now, as far as the different perils, the Josh Gibbs affidavit makes clear that there are different perils. And guess what? Windstorm or hail are usually written together as one peril and for one charge. That's different than fire or earthquake or flood. And that's apparent in the worksheet he uses that has those perils lined up and identify each. There's not a charge for windstorm or different charge for hail. There's only one charge you can make for that peril, and that's the way carriers write policies. Because when you have a windstorm, it's very easy to say that. I mean, that that's usually where hail is is apparent. Finally, in the deductibles under windstorm or hail, and the first one is just for windstorm or hail, the second to bring in and include the concept of name storm that has all this flooding and other stuff. So why would it have? Well, you need to wrap it up. Oh, well, my only point is, if if S. C. D.'s argument is correct, why would the Lexington policy had have three different deductible schemes? If, in fact, windstorm always brings into account flood in the things from a name storm because they're very different in this deductible allocation provisions in the peril allocation provisions of the deductible. Thank you very much. We appreciate this case is submitted. We appreciate you appearing today virtually, and we look forward to continuing to consider your case. Thank you. Thank you.